Good morning, your honors. Good morning. Okay, let's give him counsel one more minute. Okay, you may proceed. Thank you. Good morning. May it please the court. Mike McCardle on behalf of the plant propellants. I'd like to reserve two minutes for rebuttal and I'll do my best to keep an eye on the clock. Your honors, this product's liability case arises out of the fatal crash of a Cessna 525 in November of 2018. The plaintiffs alleged that it was caused by the dangerous condition of the Atlas, which was a winglet system that was installed on the accident aircraft in May of 2018, pursuant to a supplemental type certificate or an STC issued to Cranfield by the FAA. This court should reverse the district court of Idaho's decision dismissing for lack of specific personal jurisdiction over Cranfield. As the court is aware, specific jurisdiction exists where defendants have the requisite minimum context with the forum state. The plaintiff's claims arise out of or relate to those contacts, and the exercise of jurisdiction comports with traditional notions of fair, planned, substantial justice. So, counsel, you're not relying upon counsel. You're not relying upon, as I understand it, our purposeful direction test here. Right. You're you're putting all of your eggs in the basket of purposeful availment. That's that's correct, your honor. Purposeful direction, which comes out of the Supreme Court's decision in Calder. And as this court is recognized in Schwarzenegger, really only it really applies when a foreign act, a tortious act outside of the state directed towards. All right. I just wanted to call it. And so in terms of purposeful availment, can you discuss, please, the activities in Idaho of Cranfield? All right. Discuss exactly what was going on. Talk about discuss the record, please, as it relates to their activities in Idaho that give right. They gave rise to this claim. Sure. So the here, the voluntary acts of Cranfield within the state of Idaho and directed at the state of Idaho fall into two related categories. Those are first, and it's a role in overseeing the work being performed in Idaho to to obtain the STC for the atlas. And the second of which, which is related, involves its role as the holder of the FAA issued STC for the atlas at all times relevant to plaintiff's claims. Now, it's it's undisputed that Cranfield had a years long relationship with Idaho based Tamarack, the goal of which was to obtain this FAA certification of the atlas. And importantly, during the course of this relationship, Cranfield worked together with Tamarack and possessed a position of substantial authority and control over the development of the atlas and getting it ready for this FAA certification. When the relationship was launched in 2013, Cranfield sent two employees to Idaho to outline the game plan, in essence, for certification. So Cranfield is determining and explaining to Tamarack the benchmarks of what is going to be needed in order to get FAA certification so the atlas can be installed on aircraft in the United States. They're saying what testing needed to be done, what data needed to be gathered, what documentation needed to be submitted, what was necessary to demonstrate that the atlas met with FAA safety and airworthiness standards. There was no design involved in that. This is just outlining the certification process. Is that correct? Right. So Tamarack developed the atlas and then turned to Cranfield and said, we would like you to oversee this process of us getting FAA certification. So if a certification revealed that it wasn't up to snuff, then Tamarack would have had to upgrade their system to come into compliance with the certification standards, correct? And so that's where this interplay between Cranfield's role as the STC holder, under which they enjoy privileges and have obligations under federal law. It's not a static figurehead type role. As the STC holder, Cranfield is certifying to the FAA that all of the data, all this testing, all this proof that the atlas is safe is valid, that it meets with the FAA's testing protocols and their testing requirements. And then as the STC holder, they have the right to control when and to whom to grant privileges to modify an aircraft pursuant to their STC. Here, when the atlas was installed on the accident aircraft in Idaho, that was done pursuant to Cranfield's STC and a service bulletin that Cranfield issued in its capacity as the STC holder. And as the STC holder, Cranfield also had continuing obligations relating to the safety of the product. Those include to report the failures, malfunctions, defects, to make sure that the product had continued airworthiness instructions available, to make required changes, to keep the product compliant with FAA airworthiness directives. So that's Cranfield as the STC holder has that obligation, not Tamarack. Mr. Ricardo, under Walden, we're supposed to look at this relationship based on the context that Cranfield itself initiates with the forum state, with Idaho here. So what do we make of the fact that this seemed to have been initiated by Tamarack reaching out to Cranfield and saying, can you help us with the certification process, as opposed to Cranfield throwing themselves into the Idaho forum? Yeah, so the vast majority of the cases, in every case that I was able to find, that issue comes up when, in essence, the plaintiff contracts with a foreign defendant and tries to basically rope them in to their home state, which obviously isn't the case here. And in this instance, we're not relying on the mere existence of a contractual relationship with a third party that's in the state. We're focusing on Cranfield's actual conduct and furtherance of that ongoing contractual relationship. I actually think Bristol-Myers-Squibb, by comparison for what was lacking in that case, is kind of illustrative of this point. For example, there was no allegation that BMS was engaging in any relevant conduct or acts with its third party in forum state distributor McKesson, which we have here. We have alleged and have facts in the record before the court that Cranfield is overseeing this process that's occurring in Idaho. It's all brewing in Idaho. Counselor, it seems like the fact that is the most significant and tangible in Idaho is Mr., I think, Missenden's trip, where he observed some sort of launch or test. Is that correct? That is. And that also is illustrative of how Cranfield's contacts with the state of Idaho go hand in hand with their continuing obligations as the STC holder. Would you agree that Mr. Missenden's trip is the strongest contact with the forum state? It is not the only, but it is probably the strongest, yes. Right. And so then I'm trying to think, is that too attenuated from the actual harm here, which is the plane crash? I don't think so. And a critical point that I think the court should consider is that Mr. Missenden's trip occurs in April of 2017. Four months earlier in December of 2016 is when Cranfield has issued the STC from the FAA. So at that point, when Mr. Missenden goes to Idaho and acts as a compliance verification engineer to observe all this testing, he's doing so in furtherance of Cranfield's continuing obligations under federal law as an STC holder. Well, I agree with that. But then how many steps between that observing the test to the actual plane crash? There's got to be dozens of steps between that. I'm not sure I'm understanding the court's question. I'm sorry. Well, under the purposeful direction test, I thought that we have to, I'm sorry, purposeful availment test. We have to show that the actual contact with the state arises or leads to the actual injury complained of. Well, that goes straight to the Supreme Court's most recent decision in Ford. I think you're alluding to a but-for-causal test. Isn't your argument that the deficiencies in the testing here by Cranfield is what gave rise to the claim because we had a defective winglet on a plane that resulted in the crash of this aircraft? That's correct. And a failure to fulfill its duties and obligations as the STC holder to make sure that the Atlas is maintaining compliance with FAA airworthiness directives and special conditions. I mean, this goes to the merits as to whether or not ultimately you would prevail on the claim. But the claim, as I understand it, arises, your allegations are, that there have been deficiencies in the testing process, certification process, that resulted in a deficient winglets installed on the aircraft that produced the crash. And I think you're right on that. And liability is obviously not the question before the court. The question before the court are, are there enough contacts? Right. And I guess that's my question, though. Then if that's your claim, how does that relate to Mr. Missenden's trip to Idaho in April of 2017? Because Mr. Missenden's trip to Idaho has to do with Cranfield's continuing efforts under its obligations as the STC holder, excuse me, to ensure that the aircraft is, that the Atlas is maintaining compliance with airworthiness directives, that it's essentially safe. Right. I just wonder if it's just too attenuated a relationship. This is a stress engineer's test, I mean, trip, correct? Correct. He's their chief stress engineer. Right. And this was, they said it was, you know, it was critical to the STC application process, passing these tests. Correct. And it's, again, it's not just a static position. Once the STC is issued, they have continuing obligations to make sure that if the FAA issues a new safety directive, they have to bring the Atlas up to compliance with it. And, again, as the STC holder, the onus falls on Cranfield, not Tamarack. Is it, does your argument hinge on Cranfield being an STC holder? In other words, if they had transferred over the STC, I don't know how this happens, but if they had transferred it at an early enough stage in the process, would your arguments not hold up in that case, under your theory? I think that they would perhaps be weaker. I don't necessarily know if they still wouldn't hold up. It's key here that Cranfield was the STC holder when the product was purchased, when it was installed on the aircraft. And when it was installed on the aircraft, it was done so pursuant to a service bulletin that Cranfield issued. I'm just trying to understand, you know, it's a consulting contract. Cranfield wasn't directly involved in the design or marketing or any of this. What is your best authority for the proposition that because they were integral to the testing process, that's enough to hail them into Idaho as a forum? It's not exactly factually on point, but I think that this court's decision in Freestream Aircraft, which we've cited in our briefs, and that's a libel or defamation case, but the court's focus on the voluntary conduct of the defendant. Cranfield voluntarily entered into this agreement, voluntarily assumed control over this process, voluntarily assumed the ability to determine any single test to pass or fail, and voluntarily assumed its role ultimately as the STC holder with all the obligations that comes with that under federal law. Doesn't the record here say that the tests were critical to safety? Yes, Judge. And if it says they're critical to safety, and then what would have happened if Tamarix, if something didn't pass the test, what would you all have told them to do? I mean, what would Cranfield, excuse me, you all, what would have Cranfield, what would have Cranfield told Tamarix to do if the test had failed? Presumably they would have told them to fix the issue, to either alter the design or, hey, there is this issue that this product is no longer, it's not going to pass FAA certification, so something needs to be done. So let me give you a hypothetical that, and the hypothetical is, let's assume that this was a breach, we didn't have this tort, but let's just say that in putting this, I know there's a contract between Cranfield and Tamarix that has a form selection clause and choice of law clause. Let's say we suppose there was the same contract between Tamarix and Cranfield, absent the form selection clause and absent the choice of law clause. Could Tamarix have sued Cranfield in Idaho State Court for breach of contracts based upon these contacts in this case? Probably not. And I think that goes to that line of case law that says that you, as the plaintiff, you can't, you know, cast your rod out, bring a defendant in, be a contract, and then sue them in your home forum. This is a different set of circumstances where the plaintiffs obviously, as the court, you understand, weren't a party to this contract or these dealings. Right, right. But why, given the extent and the nature of the contacts, why wouldn't Tamarix, so you're saying Tamarix couldn't sue Cranfield on a contract claim arising out of the same set of facts in this contract, but nevertheless, you all can, there's personal jurisdiction for a claim by you against Cranfield that also arises out of the same contract. Why does it matter that this is the tort claim versus a contract claim, since purposeful availment can apply both, you know, it normally applies in contract cases, but it can also apply in tort cases. But it seems to me that it's, that it's, both have to go the same way. If there's no personal jurisdiction as to Cranfield in a contract claim, then how can there be personal jurisdiction in a tort claim using basically the same legal theory? The basis of liability is going to be different. The contacts that are relevant to a personal injury, to a product's liability claim, are all these contacts relating to the safety of the atlas, ultimately. The contacts with the forum state are going to be different in the context of a pure contract or breach of contract case. I'm sorry, do you agree that you could use the purposeful availment for tort cases? Pardon? Well, do you agree that the purposeful availment test is available for tort cases? I just have, has the Ninth Circuit ever applied it in a tort case? The Ninth Circuit, I don't believe has, but in, sorry, Jay McIntyre, which is obviously, it's a Supreme Court case, that's a product's liability case in which the court applied purposeful availment. Okay, you want to, we'll give you some time on rebuttal. Thank you, Your Honors. Thank you, Your Honor. Greg Miller of Perkins Coie on behalf of Defendant Cranfield Aerospace Solutions. Your Honors, the district court correctly concluded they could not exercise specific personal jurisdiction over Cranfield Aerospace Solutions in this case. This is a product's liability lawsuit brought by out-of-State plaintiffs against an out-of-State defendant for an out-of-State injury without producing any evidence of in-State tortious conduct by the defendant. Under well-settled principles of jurisdiction, this case was correctly decided. Counsel, in terms of the evidence of the tortious conduct, we have allegations and that goes to the merits here. The question here is, do the claims arise out of your client's contacts in Idaho? And you've admitted in your brief that the tests that you all performed were all critical to safety. Yes. Well, Your Honor, to be clear, all 200 of the tests that were performed over the course of this five-and-a-half-year relationship are safety critical because that's what the certification process is aimed towards. But the fact that they are safety critical does not mean that they arise from or relate to the particular case. Well, how is that if you all didn't, if you were, if you didn't do what you were supposed to do, if Cranfield didn't adequately perform the testing and therefore there were defective winglets installed on this aircraft, how is, how does this claim not arise out of this activity? Well, I would point you to Judge Bumate's questioning directing to the plaintiff. They concede that the closest contact they have in this case is the trip that Mr. Missenden made to Idaho to observe testing that was going on. Well, that's part of it. But that was, he was a stress engineer for a critical test or a number of critical tests conducted over several years. Yes. And so first of all, let's, let's be clear. His personal, him being at the facility for those tests was in no way important to it occurring. As we pointed out in the brief, and there's no dispute, he was invited by Tamarack to observe those testing. And then as Peter Howarth testified in his deposition, it wasn't until a year-and-a-half later where they had gone through all of the data that was generated and ultimately signed off on those that there was approval for those tests that had been done. I think it's fair to say that in this era of remote work that, you know, personal travel is of less significance than it used to be. It's still certainly a relevant factor that one, that one that we consider. But it's not, it's not dispositive in and of itself. That might be true if we got to the third prong where we're talking about the reasonableness. But there is no support in this Court's precedence that the greater availability of international travel matters in terms of the minimum contacts inquiry on the first prong. And I would direct you to the reasoning of that, that this Court has consistently provided, is that when you were invited by a client to come twice over the course of a five-and-a-half-year relationship to observe conduct that's going on at the client's facilities, that's a favor done to the client, and it's a unilateral action by the client that's bringing you into the forum. It's not the defendant availing itself of the benefits of the forum itself. Mr. Miller, what do you make of counsel's arguments that, okay, so they were invited to come on, but they played an integral and, in fact, perhaps controlling role in the testing process itself? Does that change our analysis of looking at purposeful, purposeful availment? So, first, I would say, no, it doesn't. But to clarify, I think we lay out in our brief that, with all due respect to my friend on the other side, he's playing very fast and loose with what the record represents as to how this relationship actually occurred. I would point you to — I think we start on page 8 of our brief laying this out. He says that Tamarack controlled and came up with the testing. Section 2.1 of the contract said that test schedules would be originally proposed by Tamarack and sent to Cranfield for review and signing off, which makes sense, because Cranfield, having expertise with EASA, which was the primary certification authority here, knew what the expectations were, and they were being hired as a consultant. And that's part of what they were asked to do, is we want to leverage your expertise. But — But if you're going down the road of debating how the evidence should be weighed, then shouldn't we send this back and just say that they established a prima facie basis for looking at this further? I'm not asking you to weigh the evidence, because there's no evidence on the other side that the plaintiffs represented. They have characterizations in their brief, but not citations to deposition testimony or to terms of the contract that actually established that their characterizations were accurate. But even beyond that, what I would tell you is putting aside how much they were weighing in on certain things, is the fact that they might have had some sort of legal authority in holding the STC certificate or providing consultation. This Court and others have been consistent that if you have a client in another forum that you're providing consulting services for or that you are a licensor for and you don't have control over their marketing of the product in the forum that gives rise to the suit, that — that is not a minimum contact with the forum itself. Schur v. Johnson is very clear on this point from the Ninth Circuit involving a law firm representing a California-based client. We also cite to a number of cases from the Fifth Circuit as well as the Federal Circuit collecting a host of cases that say that when you have a licensor who licenses a licensee to act in the forum, but they don't exercise control over the actual marketing and distribution of the trademark, it's not a contact with the forum itself. So you're actually — but your client is exercising control over Tameric over the critical issue of safety of this product. And I'm looking here at S.E.R. 68. This is from your own supplemental excerpts of record. But the contract itself is that Tameric is responsible — excuse me, Tameric. Cranfield is responsible for approving any test schedules and reports that goes to the FAA. You all are — Cranfield is the final say as to what is submitted to the FAA to get this thing approved. And this thing had never been approved. There never would have been a crash to begin with. So to be clear, their role is to provide and sign off on the data that's being generated to test — to demonstrate that it meets the regulatory standards set forth by EASA and by the FAA. And there are no non-conclusory factual allegations in the complaint, especially regarding Mr. Missenden's trip to Idaho, that establish that Cranfield was negligent in the performance of its services. And I would point you to the NTSB report, which we cite in our brief, that isn't responded to by the plaintiffs, that there are no sufficient factual allegations that there was a negligent performance of Cranfield's services that contributed to this crash. But more importantly, I think — What are the merits of the tort claim to decide personal jurisdiction? Well, inevitably, part of the arise from or relate to criterion requires a consideration of proximate cause, which both has factual and legal components to it. But I think more importantly is you keep focusing on the Federal regulations that are provided here, but that is not Idaho law. That is — that — the only connection here is Federal regulations that Cranfield was playing a role through the bilateral agreement to certify. And if you look at our arguments in the brief, the FDIC case from — from the Ninth Circuit has held that you cannot use Federal law to claim that there is reciprocity with a particular State. In that case, it was Federal banking law that the plaintiffs were attempting to use to claim that there was reciprocity with California as a forum. There — you cannot use FAA regulations as the basis to claim that there is reciprocity with Idaho as a forum, because under Ford, Volkswagen, Jay McIntyre, and Bristol-Myers Squibb, the Supreme Court has — has repeatedly emphasized that injury in the forum to an in-forum resident is what triggers the sovereign's interest in providing a forum for a resident of that State to invoke its laws to hail an out-of-State defendant into its courts. And when you don't have those necessary components, you don't have the — the beginning basis to — to trigger that reciprocity analysis that the Court has consistently emphasized is incredibly — is the bedrock of the minimum context analysis under the first prong. So you're — you're saying if — even if there was extensive control over testing or — or something else, if there is no injured party within the forum State, game over, it's done? Yes. I think that — that is the fairest reading of this Court's precedents and the Supreme Court's precedents in this case, is that if you have — I mean, if you look under the purposeful direction precedents that this Court has put out, it has treated in-State injury as a requirement for a — a suing an out-of-State defendant on an in-State tort claim. We're not talking about purposeful direction here. We're talking about purposeful availment. So two — two things on that. This Court has articulated these — these two separate tests. The Supreme Court has never blessed that — that division. This Court has often said — and we — we address this in the brief — that there's not — we sometimes will apply one and other. It's not a firm and strong line. And what I would direct you to is that every time the Supreme Court has dealt with a product liability claim, they have looked to in-State injury to an in-State resident as being part of their — really two components here. There's the sovereign's interest in providing a forum and in rendering a final judgment that binds the defendant, and then there's the defendant's liberty interest in how they structure their contracts. Roberts. But be careful what you ask for, because if we collapse the purposeful direction and purposeful availment test together, and I grant you that the Supreme Court hasn't recognized the dichotomy that we've recognized in this Court, it seems to me that because the tort arose in the State, that would be sufficient under direct purposeful direction. So to be clear, the tort did not arise in Idaho. The tort arose in Indiana. Well, it's alleged to have arised in Idaho. The tort was the negligent performance of its duties by your client. That's what's alleged. That's what this whole case is about. Under basic choice of law principles, a tort arises in the place where the injury occurs. We have argued extensively in our briefs, and plaintiffs haven't disputed, that the injury occurred in Indiana and that Idaho law would not apply to this case. But I'm happy for you all to keep them separate. And I think to go back, I really want to emphasize a question that you ask, Judge Baker, to my friend on the other side, is that if Tamarack sued Cranfield and there was no forum selection clause and no choice of law clause, could they sue Cranfield? And he admitted, no, they couldn't. I think that's the ballgame, because if you look, they're relying completely on the commercial relationship between Tamarack and Cranfield to loop Cranfield into this case. But if Tamarack couldn't sue Cranfield and the whole basis of bringing Cranfield into the forum is that commercial relationship, then it can't possibly be enough for a third party who is not privity to that agreement to bring Cranfield into the forum. And more importantly, I apologize, I wasn't able to locate the specific footnote in our brief, but the one argument that the plaintiff offers in to try and address that is to say, well, you have to look at plaintiff-specific solicitation is really what's important here. We lay out that that is absolutely contrary to binding Supreme Court precedent. Whether it's a plaintiff or a third party, it's the defendant's own conduct that initiates contact with the forum itself that matters. And that's what this Court really emphasized in the Omeluk decision, which I would say to you, you ask for the best authority from my friend on the other side, I would tell you that Omeluk is probably the closest factual case that we have here. If you may recall. Roberts. So can I ask, so you discussed that the Supreme Court has never recognized this dichotomy, but under Ninth Circuit precedent, are we allowed to use a purposeful availment test? I am not aware of anything that precludes you from doing so. Putting it on my law clerk hat, the Yahoo decision, which was en banc, said that sometimes a combination can be deployed. So I think that you all came to the Court. I think you have latitude here as to how you go about addressing this. Didn't we use purposeful availment in LNS enterprises recently? So we addressed this in a footnote as well, Your Honor. It's not clear quite what the Court applied. They used the phrase purposeful availment, but they don't disclaim one or the other. And what I would tender to you is that really in a lot of ways, the purposeful availment test is very similar to the first prong of the purposeful direction test. We lay this out in a footnote as well. Whether or not you're seeking to cultivate a market is a lot of times what the forum specific conduct is that this Court looks at in the purposeful direction test. And I think most importantly, in LNS enterprises, we did not have out-of-state plaintiffs bringing claims based on an out-of-state injury. And that fact, I would tender to you, has always been crucial. In fact, Ford Motor Company relied on that in rebuffing all of the arguments that the plaintiff had made, or that the defendants had made, rather, under the precedents that they were invoking from prior decisions. And the Court emphasized over and over again, I think no more than, no less than three times, called it a rule that if you were, that you look to if the defendant was cultivating a market and the product then caused an injury within that forum. That's what Justice White hammered home in the Volkswagen decision, which was the primary authority that was at issue there, is what triggers the sovereign's interest in imposing a binding final judgment on the defendant, which is what the core concern of the due process minimum context inquiry is, is an injury to their — to a resident of their forum. And I would point out, in reading back through Burger King, even Judge Brennan, under the purposeful availment test, emphasized that Burger King was a Florida corporation, that there was foreseeable harm to an in-State resident there. But to allow a contract which expressly disclaims the forum and disclaims its laws and specifies another forum's laws, again to go back to Omeluk, this Court has held that that is not a purposeful availment of the forum that your client happens to — to go on. Again, I think Omeluk, which is never addressed by the appellants in either versions of their briefs, is as close to an on-point authority as you have here. And it's clear that when you have an — when you have no in-State injury, you have no in-State resident suing, and the defendant has, at most, attenuated contacts with the forum, it is not enough to exercise jurisdiction over them. Thank you, Counsel. Go ahead, Mr. McArdle. Thank you, Your Honor. The first thing I would like to address, and I think this is a critical point, that there is an insinuation that we've just made conclusory allegations of control over this whole testing process. I would point the Court to the excerpts of record, page 48, which is the deposition of Mr. Howarth, and speaking about the trip that Mr. Missenden made to Idaho, he says, question. So he, Mr. Missenden, was not only there to observe the test in Idaho, he literally had control over whether or not the test was a pass or a fail, correct? Yeah, answer. That's true, yeah. That's true of all the work they did for us. And it goes on. Question. Cranfield had had not only seen on the ground, or boots on the ground, as we sometimes say in Idaho, but also had authority to pass or fail any given test for certification purposes. Isn't that right? Answer. Yes, our role as the applicant for the STC, we have to take responsibility for all the data submitted for that, whether it's test states or analysis or whatever. So I just wanted to push back a little on the notion that this is some conclusory allegation. This is directly from the testimony of Mr. Howarth. Another key point, I think, is we're not merely relying upon a commercial relationship between Tamarack and Cranfield standing alone. This case is about Cranfield negligently performing its oversight of the safety and testing requirements to get this product certified by the FAA so that it could be installed on the accident aircraft. At bottom, this case is one where we have Cranfield voluntarily assuming a role of substantial power and control related to the safety of the Atlas, both in pre-application processes and once the STC was issued, all of which were centered on efforts physically being performed in Idaho and directed at Idaho. And Cranfield derived benefits from these contracts, both financially and as the STC holder in the authority they were granted. Under these circumstances, the exercise of jurisdiction by a court in Idaho is appropriate and this court should reverse the district court's decision. Thank you. Thank you very much, counsel. This case is submitted and we are adjourned for today. The court for this session stands adjourned.
judges: BUMATAY, SANCHEZ, Baker